# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 14, 2001 Session

## STATE OF TENNESSEE v. RICKY A. BURKS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-A-133     Walter Kurtz, Judge**

---

**No. M2000-00345-CCA-R3-CD - Filed May 25, 2001**

---

Ricky A. Burks was convicted by a Davidson County jury of the first-degree murder of his wife. The trial court granted Burks' motion for judgment of acquittal and entered a judgment for second-degree murder. Following a sentencing hearing, the trial court sentenced Burks, as a range II offender, to forty years confinement in the Department of Correction. Burks now appeals both the judgment of conviction and the sentence entered by the Davidson County Criminal Court, challenging the trial court's (1) denial of his motions to suppress; (2) admission of prior bad acts of the defendant; (3) jury instructions regarding prior bad acts; (4) admission of autopsy photographs of the victim; (5) refusal to instruct on the lesser-included offense of reckless homicide; (6) finding that the evidence is sufficient to support a conviction of second-degree murder; and (7) imposition of the maximum sentence of forty years. The State cross-appeals challenging the trial court's ruling in reducing the jury's verdict of first-degree murder to that of second-degree murder. Finding no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

C. Dawn Deaner, Assistant Public Defender (on appeal), Nashville, Tennessee; Jeffrey A. DeVasher, Assistant Public Defender (at trial), Nashville, Tennessee, for the Appellant, Ricky A. Burks.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Elizabeth T. Ryan, Assistant Attorney General, and Katrin Novak Miller, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

The Appellant, Ricky A. Burks, was convicted by a jury of murder in the first degree and sentenced to life imprisonment.[1] Pursuant to Rule 29 of the Tennessee Rules of Criminal Procedure, the trial court set aside the jury's verdict finding that the evidence was legally insufficient to support premeditation and accordingly, reduced the conviction to second-degree murder. The Appellant was then sentenced to forty years as a range II offender. Both the Appellant and the State appeal as of right from the judgment of the trial court.

The following challenges to the conviction and sentence are raised by the Appellant:

I. The trial court erred in denying the motion to suppress evidence seized from the Appellant's van;

II. The trial court erred in denying the motion to suppress the Appellant's October 7, 1998, statement to police;

III. The trial court erred in denying the motion to suppress the Appellant's July 2, 1999, statement to Detective Mason;

IV. The trial court erred in admitting evidence of the Appellant's prior assault of the victim;

V. The trial court improperly instructed the jury after admitting evidence of the Appellant's prior assault of the victim;

VI. The trial court erred in admitting autopsy photographs of the victim;

VII. The trial court erred in refusing to instruct the jury on the lesser-included offense of reckless homicide;

VIII. The evidence is insufficient to support a conviction for murder in the second-degree; and

IX. The trial court erred in imposing a forty-year sentence.

---

[1] On January 29, 1999, the Davidson County Grand Jury returned indictment number 99-A-133, charging Ricky A. Burks with the October 6, 1998, premeditated murder of his wife, Mary M. Lyons.

In its cross-appeal, the State contends that the evidence presented at trial is sufficient to support a conviction for first-degree murder and asks this court to reinstate the jury verdict and sentence of life imprisonment.

After carefully reviewing the record and applicable authorities, we affirm the judgment of the trial court. We conclude that the evidence presented at trial, while insufficient to establish premeditation, supports a conviction for murder in the second degree of Mary Lyons. Additionally, we find the sentence imposed not excessive.

## Background

On October 6, 1998, the Communications Division of the Metro Police Department received three anonymous 911 telephone calls. Ricky McWright testified regarding the three telephone calls made on October 6, 1998.[2] The first call was made at 5:15 p.m., the second at 7:19 p.m., and the third at 7:46 p.m. The first call, made by an unidentified male, reported that, while the caller was doing some concrete work, he heard a woman and a teenager arguing. The caller added that the following day, he returned and observed the body of a deceased woman on the porch of a vacant house. The caller then hung up. The second phone call, made by the same unidentified male, reiterated the fight between the woman and the teenager and also the discovery of a body. The caller provided the location as 120 Hart Lane but refused to identify himself, preferring to remain a "Good Samaritan." The final call was again made by the unidentified male. During this call, he stated that he had overhead the woman calling the teenager "Michael." He also described the teenager as a black male, approximately fifteen or sixteen years old. Again, he refused to get involved and refused to identify himself. All three calls were made from public telephones.

Metro Police Officer Donald Barnes was on patrol in east Nashville on October 6, 1998. During his shift, he was dispatched to a residence located at 120 Hart Lane, a vacant house, in response to a call regarding a "body at that location." On the porch of the residence, Officer Barnes "observed what he thought was a person lying on a sofa, covered by a sheet." Upon closer inspection, Officer Barnes realized that the person was a deceased female. Barnes' partner, Officer Edward Michael Shea, testified:

> [I]t was an older house that appeared to be vacant at the time. The body of the victim was laying on a couch on the front porch. And she was partially nude, with . . . abrasions about her arms and legs and chest area. She had lacerations into her head. There was a definite state of decomposition about her due to the maggot larvae that was present in the nostrils and the ears. And I also noticed possible ligature marks around her neck area.

---

[2]Ricky McWright is employed as a civilian supervisor in the Communications Division of the Metro Police Department. The Communication Division is responsible for recording all 911 telephone calls.

All attempts in obtaining fingerprint evidence proved unsuccessful. No weapons or other evidence were discovered at the crime scene. Detective Tim Mason testified that no blood was found at the crime scene. Investigators concluded that the body had been placed at the location after the murder. The victim, Mary Lyons, was subsequently identified through her fingerprints which were on file due to her employment as a school patrol mother for the police department.[3]

On October 6th and again on October 7th, the Appellant mentioned to his employer, Michael Wynne, that his wife had not come home and he was concerned. Mr. Wynne suggested to the Appellant that he fill out a missing person's report. On the morning of October 7th, at approximately 9:00 a.m., the Appellant, accompanied by Mr. Wynne, drove to the police station for this purpose. At 1:42 p.m., Detective Mason talked with the Appellant regarding the murder of his wife. In an attempt to "figure out what happened to [the Appellant's] wife," Detective Mason asked the Appellant to relate the events of the past week. The Appellant recalled:

On Monday I take [sic] my wife and I went to my job. And we shot the breeze with my boss man a little while. And that afternoon, when I got off, uh, I went to the Kroger store on, uh, Dickerson Road. And uh, as I was coming into the parking lot, uh, Michael got out of a van with two white women. There was [sic] some kids. I know they was [sic] white or something. And, uh, he flagged us down before we got ready to park. . . .

. . . I went in the store and uh, when I come back out, he and my wife was [sic] discussing something about them slipping and doing what they had to do you know . . . Uh, they been sleeping around. And uh . . . they had . . . started an argument. I just left on my own. . . . [S]he decided that she wanted to go up there and see if there's a sign in front of the house. . . . [W]e were going to try to buy the house. . . . [W]e went up there, and . . . stayed there a minute or two. And then I went back, she told me that she had to go back to the bank. Because she said we didn't, hadn't got enough money for what she wanted. And she told me to get . . . she ain't goin' to be but a minute. So, she said well I am going in here and you can you can pick me up on your way back go down there. Go get you a bottle or something. So, I went down there to get the bottle. And when I got the bottle and come back, she wasn't there. So, I automatically left and went to the house. . . . She wasn't there and then I come back. . . .

. . . Tuesday woke up, I went to work. And . . . I told my boss, something was bothering me. My wife, don't usually do that. She goes somewhere, but she comes back. And uh, but we worked and uh I got off yesterday evening. I decided to go

[3]Margaret Snorten, the victim's sister, testified that Mary Lyons was 5'4", weighed 115 pounds and was sixty years old. Ms. Lyons was the mother of eight children and grandmother of fourteen children. Ms. Snorten related that the Appellant and her sister maintained separate households and that Ms. Lyons resided with an adult daughter on Settle Court in Nashville.

back and back track myself. . . . I got drunk and went back to the house. . . . I seen this sheet on this thing. I knowed [sic] it wasn't her. . . . And uh, then I come made the phone calls. I made the three phone calls. Because I was concerned about her and I couldn't, I didn't stay there, because I couldn't stand the sight of what I had seen.

After consultation with the District Attorney's Office, it was decided, however, that there was insufficient proof to charge the Appellant with the homicide. At this point, the Appellant was permitted to leave.

Detectives Mason and McAlister walked the Appellant to the front of the building where they encountered Ms. Lyons' son, Fabian. Fabian Lyons began threatening the Appellant. For his own safety, the Appellant was directed back into the police station into the room where he had been previously interviewed. At this point, Detective McAlister inquired, "Well, you didn't kill your wife, huh?" The Appellant replied, "No, I didn't." McAlister responded, "Well, what's that blood doing on your boots." The Appellant then stated, "Yes, I killed her." Shortly thereafter, the Appellant gave the officers consent to search his van. Upon entering the van, the officers noticed that the van "smelled really bad on the inside. And there were flies." The officers also observed blood splatters throughout the van.

TBI Special Agent Mark Squibb, a serologist, examined numerous samples of physical evidence containing unidentified blood splatters. After collecting known specimens from both the victim and the Appellant, Squibb testified at trial that the blood splatters on the Appellant's eyeglasses were those of Ms. Lyons, blood splatters located on a blanket found in the Appellant's van belonged to Ms. Lyons, and a blood sample from the victim's pants was identified as the Appellant's blood.

On July 2, 1999, while Detective Mason was transporting the Appellant to the hospital to have blood drawn pursuant to a search warrant, the Appellant remarked that he wanted to plead guilty because any sentence that he received would effectively be a life sentence. Detective Mason asked the Appellant what he meant by that statement. The Appellant responded, "You know I did it, and that basically everybody knows that I did it."

At the Appellant's subsequent trial, Michael Anthony Wynne, the owner of Landmark Paving Company, stated that two months prior to the death of Ms. Lyons, he had employed the Appellant to complete miscellaneous tasks, including operating the asphalt roller and loader. Mr. Wynne recalled that on the morning of October 5, 1998, the Appellant reported to the shop at 6:30 a.m. as usual. On this date, Mr. Wynne observed a dark-skinned woman in the Appellant's van. The Appellant introduced the woman as either his girlfriend or his wife. The men did not work that day, but Mr. Wynne gave the Appellant twenty dollars before leaving. The following morning, the Appellant reported to work. On this date, the Appellant mentioned that his wife did not come home the previous night. At lunch, Mr. Wynne noticed that the Appellant's hands were swollen. On October 7th, the Appellant again mentioned the disappearance of his wife. Mr. Wynne recalled that

the Appellant mentioned "a dead woman at 120 Hart Lane" and that "he used to live in that house." On this date, Mr. Wynne accompanied the Appellant to the Criminal Justice Center.

Cheryl Gray, the victim's daughter-in-law, testified that on January 12, 1998, approximately nine months previous to the murder, she was notified that Mary Lyons was admitted to Metro General Hospital. Ms. Gray stated that Ms. Lyons' "face was swollen beyond recognition. . . . Her eye was completely closed. Her arm was laid open from a deep cut wound, almost to the bone." The Appellant was present in Ms. Lyons' hospital room. Ms. Lyons appeared "[s]cared, shaky, real nervous." Ms. Gray asked Ms. Lyons what was wrong. When the Appellant left the room for a short period of time, Ms. Lyons hugged Ms. Gray and whispered that "she was scared, and that [the Appellant] had beat her."

Dr. John E. Gerber, an assistant medical examiner, testified that an autopsy was performed on Mary Lyons on October 7, 1998. The autopsy report revealed that, due to the presence of "blow flies or eggs about her body," the absence of "rigor mortis," and "discoloration of her skin," the victim had been dead for one to two days before her body was discovered. The autopsy report and photographs of the deceased also established the presence of abrasions and defensive wounds on the body. Dr. Gerber continued to describe the injuries suffered by the victim:

> Over the right eye . . . a laceration. There were multiple contusions. . . . On the side of her face . . . there were numerous rectangular abrasions. And then on the neck, there was a series of rectangular abrasions in here, actually, the series of somewhat chop marks, but rectangular overall. . . . And under the chin, there were, again, rectangular type . . . abrasions on both the right and the left side. . . . And there was a large mark back in through here, too, again, a somewhat rectangular abrasion that was quite prominent. Also, on the left side of the arm . . . there's a triangular abrasion in that order.

Dr. Gerber explained that the abrasions to the victim's face and upper extremities were not consistent as made by a fist, but were consistent with being made with a "weapon of some sort." The victim was not strangled, but there was a soft tissue hemorrhage underneath the right side of the thyroid, indicating there was a significant amount of pressure to the neck. Dr. Gerber continued that the cause of death was "a subdural hematoma," *i.e.*, "[w]hen there is a significant enough force to cause the veins or arteries in [the brain] to tear, [resulting in] blood collect[ing] here." Specific to the victim's case, the subdural hematoma was caused by the "twisting and tearing of the head and moving about of the head so that there's enough force to tear the vessels underneath this structure I call the subdural area." He opined that Mary Lyons did not die immediately but, "most likely she became unconscious and died sometimes afterwards."

On cross-examination, Dr. Gerber related that the autopsy report indicated that the victim's blood revealed "cocaine in the blood, cocethylene," ethanol, and benzolecanine. He explained that "[c]ocethylene is cocaine and ethyl alcohol bonded together so they adhere to one another and form

a compound that acts more than cocaine itself or more than alcohol itself." Benzolecanine is a cocaine metabolite caused by the breakdown of cocaine.

The jury returned a verdict finding the Appellant guilty of first-degree murder and sentenced the Appellant to life imprisonment. The trial court subsequently found the proof legally insufficient to support premeditation and reduced the Appellant's conviction to second-degree murder.

## I. Motions to Suppress:

### A. October 7th Statement
### B. Evidence Seized from Van
### C. July 2nd Statement

The proof at the suppression hearing developed the following facts: On October 7th, the Appellant went to the Criminal Justice Center and advised that he was the husband of Mary Lyons. During his initial contact with Detective Mason, the Appellant was neither under arrest nor in custody. After providing an initial statement, the Appellant left the building. At the front of the building, some of the victim's relatives had gathered and were threatening the Appellant. Concerned for the Appellant's welfare, the officers escorted the Appellant back to the Murder Squad Office. While in this room, Detective McAllister observed blood on the Appellant's boots. McAllister inquired, "So you didn't kill your wife." The Appellant responded negatively. McAllister added, "Well, what's that blood doing on your boots." At this point, the Appellant dropped his head. He was asked, "Do we need to go back in and do another truthful statement?" The Appellant replied, "Yes, I killed her." To this point, no Miranda warnings had been provided.

A second interview of the Appellant was taped. Detective Mason testified that when he took the Appellant's second statement, he started to give Miranda warnings, but the Appellant interrupted him with questions and he forgot to go back through them. Specifically, the Appellant interrupted Detective Mason's Miranda litany, inquiring specifically about his right to an attorney. Although the Appellant was not free to leave, he was not placed under arrest until the conclusion of the second interview. After the second interview, the Appellant signed a consent form authorizing the search of his van that he had driven to the Criminal Justice Center. Detective Mason stated that had the Appellant refused to sign the consent form, he would have taken the van into custody and obtained a search warrant.

On July 2, 1999, a search warrant issued directing that blood samples be obtained from the Appellant's person for comparison testing. The Appellant was transported in custody to the hospital to have the blood drawn. En route, the Appellant asked Detective Mason what the State's offer was and remarked that he wanted to plead guilty because any sentence he received would effectively be a life sentence. Mason inquired as to what the Appellant meant by that statement. The Appellant continued, "You know I did it, and that basically everybody knows that [I] did it."

The trial court entered the following findings of fact and conclusions of law:

The first, No. 1, issue has to do with the statement that was given, the interview beginning at 1:42 p.m., on October the 7th. That interview there, I don't have any problem with. I think the defendant, apparently, drove himself down to the police station. He was not in custody. So the Miranda decision, and I don't think that the defendant really disputes that much, would not really apply. It's not a custodial interrogation. The interview from 1:42 on, where I think the defendant primarily was saying that he didn't do this, was giving all kinds of explanations about different things, about the school mothers and some tall, young guy, and all these different things, whatever it was, I don't think that's really an issue. I think that statement, for whatever value it would have, is admissible.

I think the second statement, you can look at it, think about it, rationalize, whatever way you want to do, but the fact is in this second interview, at the very beginning of the interview, it was obvious that the defendant was no longer free to go, and it was a custodial interview, subject to the Miranda guidelines. This defendant, at the very beginning of that interview indicates that he wanted to have an attorney. He says, well, let me get a lawyer, if you're fixing to charge me. It was obvious that he was being charged. There was blood on the boots. I think that there was grounds to make an arrest. Later on, just a couple of minutes later, I need a lawyer, Man, because I ain't going to get the death penalty, and I need a lawyer. He says that again.

Somewhere along the line, Detective Mason does begin to give him his rights against self-incrimination and so forth, but never really . . . gets through that, and apparently never is really given the standard Miranda warnings nor is there a waiver signed.

Detective Mason . . . acknowledges if the man wants to get an attorney, he has the right to get an attorney. But, frankly, it's not at issue here whether or not the man knew that he had the right to have an attorney. It's whether or not he was given the opportunity to have an attorney when he's requested an attorney two or three different times during this interview.

So, I think . . . in this second interview that started on 3:10 . . . p.m., on October the 7th, 1998, he didn't initiate this interview. After he said he wanted an attorney, he requested an attorney more than once. He really, frankly, never waived his rights to an attorney and — and really was not actually even warned of his rights.
. . .
So I don't think that there's much of an issue here on the interview at 3:10 p.m., that the Motion to Suppress should be granted as to that interview. . . .

Issue No. 3 has to do with the evidence from the van. I don't think that's much of an issue from what I'm gathering here. The evidence in the van didn't really do anything that incriminated the defendant. The blood that was collected or whatever

else that came out of this matter that started off about the shoes was actually this defendant's blood, so . . .

. . . I think with regard to the van matter and the Consent to Search of the van, I think that's distinguishable from the second interview.   . . . [The consent] was given, apparently, according to the form, at 3:35 p.m.  But I do not believe the finding of this Court that requires this court to suppress the evidence from the second statement would carry over to and necessarily negate the voluntariness of the consent that was given to search that van.

So your Motion on that particular issue is going to be respectfully overruled.  I think whatever the van has . . .  is distinguishable.  . . . I think there was a consent there. We have a written waiver here.   And I think this defendant knew he had a right to . . . not give the consent, but I also think, frankly, based on everything that I've heard here, and I did find to make the ruling on the second interview, that the officers had probable cause to make an arrest and that the defendant was in custody.  He was no longer free to go.

And we can beat around the bush all you want to here, but, once that came out, and Detective McAllister noticed that blood and whatever was said then or whatever, from that point on, this man wasn't going anywhere.  And I think it was custodial, but I do not think defeats the Consent to Search the van.  So I think that search is . . . valid under <u>Schneckcloth vs. Bustamonte</u> and the Tennessee cases that go to that issue.

The only last thing, . . . that you have is this situation on July the 2nd of 1999.  The uncontradicted testimony . . ., is that on July the 2nd of 1999, . . . Detective Mason . . . was driving this man somewhere under a valid search warrant to get blood. . . .

. . . on the way to the hospital, without any questions being asked, because he had been told to ask no questions, the defendant made an unsolicited, volunteered, as opposed to voluntary  . . . under <u>Miranda</u>, statement that was not in response to any questions that were being asked by Detective Mason.  I think that is different from the other interview, back whenever it was in . . ., October the 7th – 1998 . . . in that it was not an interrogation process that was there.

. . . the [Appellant] made some kind of unsolicited remarks about what was going to happen on his case . . .    I think that statement can be admitted . . . This is just a volunteered, spontaneous, unsolicited remark. . . .
. . .
So the Court is of the opinion, No. 1, the first statement is fine.  It wasn't custodial. The second statement is suppressed.  It was – it was in violation of the <u>Miranda</u> decision. . . .   The third issue having to do with the Consent to Search the van, that

Motion is respectfully overruled. . . . And on, finally, July the 2nd, apparently, three weeks ago, or whenever it would have been, on the way to the hospital, that this man is saying stuff, nobody is even asking him anything. And that's his problem because it's an unsolicited, volunteered statement. And that statement can be admitted.

The Appellant now contests the rulings of the trial court asserting:

(A) the October 7th statement should have been suppressed because (1) no <u>Miranda</u> warnings were given prior to the statement and (2) any statements made after his boots were seized and he was no longer free to leave should be suppressed;

(B) the evidence found in the van should have been suppressed because his consent to search the van was not voluntarily or intelligently given;

(C) the July 2nd statement should have been suppressed as violating <u>Edwards v. Arizona</u>.

In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. <u>State v. Daniel</u>, 12 S.W.3d 420, 423 (Tenn. 2000) (quoting <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)); <u>State v. Timothy Walton</u>, No. W1998-00329-SC-R11-CD (Tenn. at Jackson, Mar. 15, 2001)(*not yet released for publication*). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. <u>Daniel</u>, 12 S.W.3d at 423. Indeed, these findings will be upheld unless the evidence preponderates otherwise. <u>Id.</u> Furthermore, this court may consider the entire record, including the evidence submitted both at the suppression hearing and at trial, in evaluating the correctness of the trial court's ruling. <u>State v. Henning</u>, 975 S.W.2d 290, 297 (Tenn. 1998). Although deference is given to the trial court's findings of fact, this court conducts its own appraisal of the constitutional questions presented by reviewing the law and applying it to the specific facts of the particular case. <u>Id.</u> (citing <u>State v. Yeargan</u>, 958 S.W.2d 626, 629 (Tenn. 1997); <u>Beare v. Tennessee Dept. of Revenue</u>, 858 S.W.2d 906, 907 (Tenn. 1993)); <u>see also</u> <u>State v. Timothy Walton</u>, No. W1998-00329-SC-R11-CD.

## A. October 7th, 1998, Statement

On October 7, 1998, the Appellant voluntarily went to the Criminal Justice Center to file a missing persons report on his wife. At this time, police officers notified the Appellant of the discovery of the body of his wife and interviewed the Appellant. The Appellant was not in custody at this time and was free to leave. In fact, at the conclusion of the interview, the Appellant did leave the building. Outside the building, however, members of the victim's family had gathered and were making threats against the Appellant. For his own safety, the Appellant was advised to return to the

building. The Appellant voluntarily reentered the building with Detective McAllister. Once inside the building, Detective McAllister observed what appeared to be blood on the Appellant's boots. McAllister commented, "So, you didn't kill your wife? Then why is there blood on your boots?" Detective Mason testified that the Appellant then dropped his head and admitted that he had killed his wife. Detective McAllister could not recall the Appellant's comments.

The Appellant contends that this admission should be suppressed because he was in custody at the time his statement was made and he had not been provided Miranda warnings. See generally Dickerson v. United States, 530 U.S. 428,120 S. Ct. 2326 (2000); Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319 (1993); Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). The Fifth Amendment protection against self-incrimination "privileges a person not to answer official questions put to him in any proceeding, civil or criminal, where the answers might incriminate him in future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426, 104 S. Ct. 1136, 1141 (1984). In fact, the statements of an accused made during the course of custodial interrogation are inadmissible as evidence unless the State establishes that the accused was advised of certain constitutional rights and waived those rights. State v. Anderson, 937 S.W.2d 851, 853 (Tenn.1996). Although we acknowledge an individual's constitutional right against self-incrimination and right to be forewarned of these rights, we likewise recognize that voluntary statements, even if incriminating, are not *per se* barred by the Fifth Amendment. See Miranda v. Arizona, 384 U.S. at 436, 86 S. Ct. at 1602; see also California v. Beheler, 463 U.S. 1121, 103 S. Ct. 3517 (1983); Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711 (1977); Beckwith v. United States, 425 U.S. 341, 96 S. Ct. 1612 (1976). It is only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning [that] the privilege against self-incrimination is jeopardized," requiring the authorities to adequately advise the individual of his constitutional protections. Miranda, 384 U.S. at 444, 86 S. Ct. at 1612; see also State v. Timothy Walton, No. W1998-00329-SC-R11-CD. In other words, before Miranda warnings are required, the accused must be the subject of custodial interrogation.[4] Miranda, 384 U.S. at 444, 86 S. Ct. at 1612.

In determining whether an individual is "in custody" as contemplated by Miranda, it is incumbent upon the reviewing court to decide whether, "under the totality of circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with formal arrest." State v. Timothy Walton, No. W1998-00329-SC-R11-CD; Anderson, 937 S.W.2d at 855. Factors relevant to this determination include, but are not limited to, the following:

· the time and location of the interrogation

· the duration and character of the questioning

---

[4]If the defendant is determined to be in "custody," the Miranda litany of rights must be administered. If the Miranda warnings are not provided, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. See Stansbury v. California, 511 U.S. 318, 114 S. Ct. 1526 (1994).

· the officer's tone of voice and general demeanor

· the suspect's method of transportation to the place of questioning

· the number of police officers present

· any limitation on movement or other form of restraint imposed on the suspect during the interrogation

· any interactions between the officer and the suspect

· the suspect's verbal or nonverbal responses

· the extent to which the suspect is confronted with the law enforcement officer's suspicions or evidence of guilt

· the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Anderson, 937 S.W.2d at 855 (citations omitted); see also State v. Timothy Walton, No. W1998-00329-SC-R11-CD. The trial court is provided a wide latitude of discretion in its decision, and that decision will not be overturned by this court unless it appears there has been an abuse of the trial court's discretion and a violation of the defendant's rights. See State v. Smith, 868 S.W.2d 561, 570 (Tenn. 1993), cert. denied, 513 U.S. 960, 115 S. Ct. 417 (1994).

We conclude that the trial court did not abuse its discretion in determining that the Appellant was not in custody during the initial "statement." "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323, 114 S. Ct. at 1529. Specifically, the inquiry is "how a reasonable person in the suspect's position would have understood his position," *i.e.*, would he have felt that he was not free to leave and, thus, in custody. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151 (1984); see also Michigan v. Chesternut, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988); State v. Timothy Walton, No. W1998-00329-SC-R11-CD; State v. Mosier, 888 S.W.2d 781, 784 (Tenn. Crim. App.1994); State v. Furlough, 797 S.W.2d 631, 639 (Tenn. Crim. App.1990). Considering the totality of the circumstances now before us, in the light most favorable to the State, we hold that the evidence supports a conclusion that the Appellant was not in custody when he made the statement in response to Detective McAllister's observation. The Appellant was voluntarily at the Criminal Justice Center for his own protection. There is no indication that the Appellant believed he was under arrest or was not free to leave at any time. At no time was the Appellant threatened or coerced into providing a statement. Accordingly, the Appellant's statement did not arise from a custodial environment with the attendant entitlement to Miranda warnings. This issue is without merit.

**B. Consent to Search Van**

The Appellant contends that his consent to search the van was not voluntarily given and, accordingly, any evidence seized during the search of the van should be suppressed. In determining the voluntariness of his consent, the Appellant requests that, since the trial court failed to enter sufficient factual findings to conduct an appropriate "voluntariness analysis," this court must conduct a *de novo* review of the issue. He asserts that, after this court's *de novo* review considering the "totality of the circumstances," this court must find that the consent was not given voluntarily or intelligently. Specifically, the Appellant contends that (1) prior to giving his consent to search his van, his constitutional rights had clearly been violated in that Detective Mason interrogated the Appellant absent Miranda warnings and with total disregard of the Appellant's repeated requests for an attorney; (2) prior to obtaining the Appellant's consent, the police engaged in a form of coercion that likely impaired the Appellant's judgment; (3) the police failed to adequately warn him of his rights regarding a consensual search; (4) the Appellant was in custody and inside the police station when he gave his consent to search; and (5) immediately prior to his consent to the search of the van, the Appellant confessed to his role in the victim's death.

It is well-settled that one of the exceptions to the warrant requirement is a search conducted pursuant to a voluntary consent. State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248-249, 93 S. Ct. 2041, 2059 (1973)); State v. Ashworth, 3 S.W.3d 25, 28 (Tenn. Crim. App.1999). The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. Ashworth, 3 S.W.3d at 28 (citing Schneckloth, 412 U.S. at 248-49, 93 S. Ct. at 2059; Bumper v. North Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 1792 (1968); Bartram, 925 S.W.2d at 230). The validity of a search depends upon whether, based on the totality of the circumstances, the consent was "voluntarily given, and not the result of duress or coercion." Schneckloth v. Bustamonte, 412 U.S. at 248-49, 93 S. Ct. at 2059. Moreover, the trial court's finding that a search is consensual will not be overturned on appeal unless the evidence preponderates against the ruling. State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990), perm. to appeal denied, (Tenn. 1991), cert. denied, 502 U.S. 1079, 112 S. Ct. 986 (1992); Brady v. State, 584 S.W.2d 245, 251-52 (Tenn. Crim. App. 1979).

The Appellant contends that the preceding interrogation, resulting in an un-Mirandized statement, "tainted" the Appellant's subsequent consent to search his van.[5] Accordingly, he asserts that any evidence obtained from the search of his van must be suppressed as "fruit of the poisonous tree." See generally Wong Sun v. United States, 371 U.S. 471, 485-86, 83 S. Ct. 407, 416 (1963) (evidence obtained by illegal police conduct is generally found inadmissible). The absence of Miranda warnings prior to an inculpatory statement does not necessarily vitiate a subsequent consent to search.

---

[5]The Appellant's un-Mirandized statement did not contain any statement by the Appellant that he had murdered his wife. Rather, the Appellant admitted that he and his wife had engaged in a physical altercation during which he had hit her with his hand. He stated that both of them had been drinking and the victim had been smoking crack cocaine. The physical altercation lasted approximately fifteen minutes, after which the victim smoked more crack cocaine. The Appellant then left. He stated that when he returned to the vacant house, the victim was dead.

-13-

See generally State v. Timothy Walton, No. W1998-00329-SC-R11-CD; State v. Kyger, 787 S.W.2d 13, 24 (Tenn. Crim. App. 1989) (citing State v. Story, 608 S.W.2d 599 (Tenn. Crim. App. 1980); see Michigan v. Tucker, 417 U.S. 433, 94 S. Ct. 2357 (1974)). The warnings provided by Miranda are procedural safeguards designed to ensure that the right against compulsory self-incrimination is protected and intelligently exercised. See State v. Smith, 834 S.W.2d 915, 918 (Tenn. 1992) (citing see, e.g., Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285 (1985); New York v. Quarles, 467 U.S. 649, 104 S. Ct. 2626 (1984); Tucker, 417 U.S. at 433, 94 S. Ct. at 2357).

In Tucker, the Supreme Court refused to apply the "tainted fruits" doctrine from Wong Sun v. United States to testimony ultimately gained as a result of a statement obtained from the defendant in violation of Miranda. Tucker, 417 U.S. at 451, 94 S. Ct. at 2367. Similarly, in Elstad, the Court stated that while the "fruit of the poisonous tree" doctrine called for suppression of evidence upon a finding of a Fourth Amendment violation, the same result did not necessarily follow when officers erred "in administering the prophylactic Miranda procedures." Elstad, 470 U.S. at 309, 105 S. Ct. at 1293. In Dickerson v. United States, 530 U.S. at 428, 120 S. Ct. at 2326, the Supreme Court affirmed its prior holdings in Elstad and Tucker, acknowledging Miranda's prophylactic procedures as recognition of "the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." See State v. Timothy Walton, No. W1998-00329-SC-R11-CD. Thus, the exclusionary rule operates differently under the Fifth Amendment than the Fourth Amendment, preferring to admit non-testimonial evidence, so long as the statements revealing the non-testimonial evidence were not coerced. Id.

Our supreme court has rejected the rationales of the Tucker and Elstad decisions with regard to admission of a subsequent confession obtained after an initial unlawful confession. See Smith, 834 S.W.2d at 921 (setting forth stricter standards for determining voluntariness of a confession made subsequent to an illegally-obtained initial confession). Notwithstanding, our supreme court has recognized that the same approach does not necessarily follow under Article I, section 9 of the Tennessee Constitution when the issue is the admission of tangible, non-testimonial evidence, noting that prior Tennessee case law holds that "[e]vidence derived from an illegally obtained confession is admissible notwithstanding the confession was, or should have been suppressed." State v. Timothy Walton, No. W1998-00329-SC-R11-CD (quoting State v. Tidwell, 775 S.W.2d 379, 388 (Tenn. Crim. App. 1989)); see also Kyger, 787 S.W.2d at 24. Indeed, in State v. Timothy Walton, our supreme court expressly rejected a *per se* exclusionary rule which would automatically exclude non-testimonial evidence obtained from a technical failure to give Miranda warnings. State v. Timothy Walton, No. W1998-00329-SC-R11-CD. Rather, the court announced that "a defendant may seek suppression of non-testimonial evidence discovered through his or her unwarned statements only when the statements are the product of an actual violation of the privilege against self-incrimination, *i.e.*, such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not 'scrupulously honored.'" State v. Timothy Walton, No. W1998-00329-SC-R11-CD (citing State v. Crump, 834 S.W.2d 265, 270 (Tenn. 1992) (parenthetical omitted)) (emphasis added). In such cases "where the fruit of the violation involves the defendant's testimonial or communicative statements, however, the heightened protections of State v. Smith, 834 S.W.2d at 915, . . . continue to apply." State v. Timothy Walton, No. W1998-00329-SC-R11-CD.

-14-

We conclude that in the present case, the heightened scrutiny announced in <u>Smith</u> applies as the Appellant specifically inquired about his right to counsel during the second interview.

In <u>State v. Smith</u>, the court held that "the extraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession . . . is tainted by the initial illegality." <u>Smith</u>, 834 S.W.2d at 919. That presumption may be overcome by the prosecution, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession." <u>Id.</u> In such cases, the crucial inquiry for the court is

> whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the state constitutional right not to provide evidence against one's self; and (2) voluntarily confessing his involvement in the crime.

<u>Id.</u> In addressing these questions, the reviewing court should examine the following factors:

> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged subsequent confession;
>
> 2. The temporal proximity of the prior and subsequent confessions;
>
> 3. The reading and explanation of <u>Miranda</u> rights to the defendant before the subsequent confession;
>
> 4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
>
> 5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;
>
> 6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;
>
> 7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;
>
> 8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered <u>Miranda</u> rights.

<u>Id.</u> at 919-920.

We acknowledge the following circumstances surrounding the Appellant's consent. The Appellant's consent to search his van was given shortly after he made incriminating statements without the benefit of <u>Miranda</u> warnings.[6] The consent was given while the Appellant was in custody. Detective Mason presented the Appellant with a written consent to search form. The consent form informed the Appellant that he had a right to refuse the search and that his consent could be revoked at any time.[7] No coercion or pressure was applied by law enforcement officers nor were any promises made to the Appellant.[8]

Upon review of the circumstances, we conclude that the Appellant's knowledge of his right to refuse consent lends support to the inference that the Appellant gave consent voluntarily. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 227, 93 S. Ct. at 2048 (knowledge of right to refuse is a factor when determining the voluntariness of consent). Moreover, the fact that the Appellant was in custody is not sufficient to demonstrate a coerced consent to search. <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976); <u>see also</u> <u>Ohio v. Robinette</u>, 519 U.S. 33, 39-40, 117 S. Ct. 417, 421 (1996). There is no indication in this record that the Appellant was a newcomer to the law, was mentally deficient, or was unable in the face of a custodial arrest to exercise a free choice. <u>See generally</u> <u>United States v. Crowder</u>, 62 F.3d 782, 787 (6th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1057, 116 S. Ct. 731 (1996).

---

[6] The statements preceding the Appellant's consent were suppressed by the trial court.

[7] The Consent to Search Vehicle form, provided, in part:
I, <u>Rickey A. Burks</u>, having been informed of my constitutional right not to have a search made of the vehicle hereinafter mentioned without a search warrant, and of my right to refuse to consent to such a search hereby waive that right and authorize <u>Det. Tim. Mason</u>, . . . and his or her designees, to conduct a complete search of my vehicle listed as, Year <u>85</u>, Make <u>Ford</u>, Model <u>Eco</u>. License Number <u>PE7638</u>, State <u>TN</u>, Vehicle Identification Number _____, Color <u>Blue</u>, which is now located at <u>501 2nd Ave. N.</u>.

These investigators/officers are authorized by me to take from my vehicle any . . . evidence . . . . that they may desire. This written permission is being given by me to the above named Criminal Investigators . . . freely and voluntarily and without threats or promises of any kind. I know that I can revoke this consent at any time.

[8] We reject the Appellant's argument that his inquiry as to "how much time criminal homicide carried" and Detective Mason's response to his inquiry constituted "a subtle form of coercion." <u>See generally</u> <u>State v. Smith</u>, 933 S.W.2d 450, 456 (Tenn. 1996) ("[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.").

-16-

Finally, there is no evidence of physical mistreatment, violence, threats, trickery, display of a weapon, or use of a commanding manner or tone. After examining these factors, we conclude the consent to search was not tainted by the initial Miranda-poor question. The State has clearly overcome the rebuttable presumption. This issue is without merit.

## C. July 2, 1999, Statement

On July 2, 1999, while being transported from the jail to the hospital for the purpose of obtaining a blood sample, the Appellant asked Detective Mason what the State's offer was and stated that he wanted to plead guilty because "anything he got would effectively be a life sentence for him." Detective Mason inquired as to what the Appellant meant by the statement. The Appellant responded that he was in his sixties and any sentence would be a life sentence for him. He also stated "you know I did it," and that basically, "everybody knows I did it." The Appellant argues that this statement should be suppressed because the statement was made while the Appellant was in custody and after counsel had been appointed to represent the Appellant. The trial court found:

> [T]his situation on July the 2nd of 1999. The uncontradicted testimony in this record, . . . according to Detective Mason's testimony, he was driving this man somewhere under a valid search warrant to get blood, . . . .
>
> . . . on the way to the hospital, without any questions being asked, because he had been told to ask no questions, the defendant made an unsolicited, volunteered, as opposed to voluntary . . . under Miranda, statement that was not in response to any questions that were being asked by Detective Mason. I think that is different from the other interview, back whenever it was in . . ., October the 7th – 1998 . . . in that it was not an interrogation process that was there.

The Appellant, in contesting the admission of his statement to Detective Mason, is essentially claiming a violation of his Sixth Amendment right to counsel during custodial interrogation. It is a firmly established tenet of constitutional law that, after the initiation of formal charges against an accused, the Sixth Amendment right to counsel attaches, guaranteeing the accused the right to rely on counsel as a medium between him and the State at any critical confrontation with State officials, irrespective of coercion. See Maine v. Moulton, 474 U .S. 159, 176, 106 S. Ct. 477, 487 (1985). Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements "deliberately elicited" from a defendant without an express waiver of the right to counsel. Michigan v. Harvey, 494 U.S. 344, 348, 110 S. Ct. 1176, 1179 (1990). The accused may not be subjected to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police. See Michigan v. Jackson, 475 U.S. 625, 636, 106 S. Ct. 1404, 1411 (1986).

It is clear from the record that the Appellant's statement was made after his Sixth Amendment rights had attached. Thus, the only question is whether the statement was made in response to improper police interrogation by Detective Mason. This determination involves questions of both fact

and law, which this court reviews *de novo*. See generally State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997) (cases that involve mixed questions of law and fact are subject to *de novo* review)); State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997).

The trial court's factual finding that Detective Mason did not solicit the voluntary statement made by the Appellant will not be disturbed unless this finding is plainly wrong or without support in the evidence. See generally Henning, 975 S.W.2d at 299 (appellate court should uphold trial court's decision on suppression motion unless record preponderates against finding). The relevant evidence presented at the suppression hearing consisted of the testimony of Detective Mason. Detective Mason related that the Appellant voluntarily and spontaneously made the statement to him. The evidence introduced by the State is consistent with the finding of the trial court.

Our next inquiry is whether the Appellant was subjected to police interrogation while in custody. State v. Timothy Walton, No. W1998-00329-SC-R11-CD.

> [T]he term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-1690 (1980) (footnotes omitted). There is a difference between police initiated custodial interrogation and communications, exchanges, or conversations initiated by the accused himself. See Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981). It is well-established that questioning initiated by the accused is not interrogation in the Innis sense. Edwards v. Arizona, 451 U .S. at 484, 101 S. Ct. 1880. At the very least, the police must have asked a question that was "probing, accusatory, or likely to elicit an incriminating response" before a court may conclude that there was interrogation. Id. Our supreme court has recently held that follow-up questions by a police officer to a defendant's initial volunteered statement do not constitute interrogation if the "questions are neutral attempts to clarify what has already been said rather than apparent attempts to expand the scope of the statement already made." See State v. Timothy Walton, No. W1998-00329-SC-R11-CD (citing Wayne R. LaFave, et al., *Criminal Procedure* § 6.7 (d), at 566-57 (2d ed. 1999)).

In the case *sub judice*, the statement was an unsolicited comment by the Appellant. There is no constitutional protection from statements volunteered by the accused. Edwards v. Arizona, 451 U.S. at 484, 101 S. Ct. at 1880. Since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. Innis, 446 U.S. at 301-301, 100 S. Ct. at 1682. Additionally, where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant. Colorado v. Connelly, 479 U.S. 157, 164, 107 S. Ct. 515, 520 (1986); Tucker, 417 U.S. at 441, 94 S. Ct. at 2362.

-18-

Given the trial court's findings that the Appellant initiated the discussion with Detective Mason and that Detective Mason did not pose any statements to the Appellant reasonably likely to elicit an incriminating response, we hold that the trial court did not err in concluding that the Appellant's statement was not the product of unconstitutional custodial interrogation. Accordingly, the motion to suppress the statement was properly denied. This issue is without merit.

## II. Sufficiency of the Evidence

The jury found the Appellant guilty of premeditated first-degree murder. The Appellant subsequently filed a motion for new trial and, in the alternative, a motion for judgment of acquittal. The trial court denied the Appellant's motion for new trial but, in accordance with Rule 29 of the Tennessee Rules of Criminal Procedure, granted the motion for judgment of acquittal, reducing the Appellant's conviction to second-degree murder. The Appellant now appeals contending that the proof is insufficient to support a conviction for murder in the second-degree. Pursuant to Tenn. R. Crim. P. 29(c), the State cross-appeals, asserting that the proof sufficiently supported the jury's verdict of premeditated murder and the trial court erred in granting the Appellant's motion for judgment of acquittal.

The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction; that is, whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Gillon, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979)); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). To determine whether the evidence is insufficient to sustain the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." State v. Campbell, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). "An appellate court must apply the same standard as a trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal." Gillon, 15 S.W.3d at 496 (citation omitted).

A homicide, once proven, is presumed to be second-degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999). The State, then, has the burden of proving the element of premeditation to elevate the offense to first-degree murder. Id. Premeditation necessitates "the exercise of reflection and judgment," requiring a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the Appellant's conduct in light of the surrounding circumstances. See generally State v. Johnny Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App.

-19-

at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; a declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S. Ct. 1536 (1998) (citation omitted). Additional factors from which a jury may infer premeditation include planning activities by the Appellant prior to the killing, the Appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted).

Taken in the light most favorable to the State, the proof established that, on October 6, 1998, several "911" telephone calls were made by an unidentified citizen reporting a fight between a woman and an adolescent male at a vacant residence on Hart Lane and the subsequent discovery of a deceased female located at a vacant residence on Hart Lane. The body was in the early stages of decomposition and it was evident that the person had suffered many injuries and trauma. The cause of death was a subdural hematoma caused by "torsion, twisting and tearing of the head." Law enforcement officers determined that the female was already deceased at the time she was placed on the front porch of the abandoned house. The victim was later identified as Mary Lyons, a Metro Police Department school patrol mother. The following day, the Appellant arrived at the Criminal Justice Complex and identified himself as the husband of Mary Lyons. While at the police station, he admitted to killing his wife. A search of the Appellant's van revealed the presence of blood in several places. Blood in the van matched that of the victim and the Appellant. At trial, the victim's daughter-in-law related a prior incident where, as a result of the Appellant's abuse, the victim had been hospitalized.

The State contends that the evidence was sufficient to establish the element of premeditation beyond a reasonable doubt. Specifically, the State argues that, in addition to the fact that, "[t]he nature of the killing is indicative of a pre-designed plan to murder the victim," numerous circumstances exist to support a finding of premeditation, including: the Appellant's prior relationship with the victim was violent; the Appellant made attempts to conceal the crime; the Appellant used a weapon on an unarmed victim; the nature of the crime was particularly cruel; and the Appellant's demeanor following the murder is indicative of premeditation.

After careful consideration of all the facts and circumstances surrounding this homicide, we are unable to conclude that the element of premeditation was established. Although we agree that this homicide was committed with a deadly weapon against an unarmed victim, that alone will not support premeditation. Otherwise, all homicides involving a deadly weapon would constitute first-degree murder. See State v. Tune, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993). Likewise, we cannot conclude that repeated blows to a victim constitute evidence of premeditation because "[r]epeated blows can be delivered in the heat of passion, with no design or reflection." Brown, 836 S.W.2d at 542. Moreover, we cannot conclude that the Appellant's admission of his culpability for the murder after the fact supports proof beyond a reasonable doubt of premeditation before the crime. Finally, the concealment of evidence after a crime is not probative of intent held prior to the crime. See West, 844 S.W.2d at 148 ("One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer.").

While we acknowledge that one could infer premeditation from the combination of factors present, we cannot conclude that these factors collectively establish proof of premeditation beyond a reasonable doubt. The absence of planning activity and the absence of the events immediately preceding the killing militate against proof of premeditation or that the Appellant killed according to a preconceived design. Absent the element of premeditation, the Appellant's conviction for first-degree murder cannot stand. Accordingly, the trial court properly granted the Appellant's motion for judgment of acquittal.

Within his challenge to the sufficiency of the evidence, the Appellant contends that the proof is insufficient to establish his identity as the killer. The identity of the accused as the perpetrator is certainly an indispensable element of any crime. See generally White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975), perm. to appeal denied, (Tenn. 1976). Identity of the accused may be accomplished by either direct or circumstantial evidence, or both. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury after a consideration of all competent evidence. See Biggers v. State, 411 S.W.2d 696, 697 (Tenn.), cert. granted, 390 U.S. 404, 88 S. Ct. 979 (1968) (affirmed on other grounds); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451 (1958); State v. Crawford, 635 S.W.2d 704 (Tenn. Crim. App. 1982). Likewise, the determination of whether all reasonable theories are excluded by the circumstantial evidence presented is primarily a question of fact for the jury. Pruitt v. State, 460 S.W.2d 385 (Tenn. Crim. App. 1970). In the present case, the identity of the perpetrator was established not only by circumstantial evidence, but also most directly by the Appellant's confessions, which left very little to speculation.[9] See Monts v. State, 379 S.W.2d 34, 40 (Tenn. 1964) (confession is direct evidence of guilt). Thus, the evidence establishing the Appellant as the perpetrator of the murder is more than sufficient.

Finally, in order to obtain a conviction for second-degree murder, the State is required to prove that the Appellant caused the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (1997). Under the facts of this case, we find that the proof establishes that the Appellant acted "knowingly" with an awareness that his brutal attack on the victim was reasonably certain to cause death. See Tenn. Code Ann. § 39-11-106(20) (1997). Accordingly, we conclude that there is sufficient evidence to support "knowing" conduct, and, therefore, a conviction for second-degree murder. See Tenn. R. App. P. 13(e); see also Jackson v. Virginia, 443 U.S. at 317, 99 S. Ct. at 2789. This issue is without merit.

---

[9]The circumstantial proof inferring the Appellant's identity as the perpetrator included: (1) the Appellant's identity as the anonymous 911 caller; (2) the presence of the victim's blood on a blanket and on the inside lens of the Appellant's glasses found in the Appellant's van; (3) the presence of the Appellant's blood on the victim's pants; (4) evidence that the Appellant's hands were swollen the day after reporting his wife missing; and (5) the Appellant's prior act of violence against the victim.

### III. Prior Bad Acts Against Victim

During the trial, the trial court permitted the State to question Cheryl Gray, the victim's daughter-in-law, regarding a prior assault of the victim by the Appellant. Specifically, Gray related the events of January 12, 1998, which resulted in hospitalization of the victim. Gray described the victim's face as severely swollen and noted a deep cut on the victim's arm. During her visit with the victim, the victim whispered to Gray that she was scared and that the Appellant had beat her. In admitting the evidence, the trial court found (1) the prior incident has been shown by clear and convincing evidence; (2) the testimony was relevant as proof of the Appellant's "hostility towards the victim, malice, intent, and a settled purpose to harm the victim;" and (3) "the prejudicial effect does not outweigh the probative value."

The Appellant now argues that "the trial court erred in admitting Gray's testimony about this alleged assault. . . ." Specifically, he asserts that "the testimony was irrelevant to any issue at trial, including intent, and therefore, it should have been excluded under Tenn. R. Evid. 404(b)." "In the alternative, he submits that even if the testimony was somehow relevant, it should have been excluded because its probative value was outweighed by the danger of unfair prejudice." In response to the Appellant's assertions that the evidence of the episode was irrelevant and inadmissible under Tenn. R. Evid. 404(b), the State cites, as did the trial court, State v. Smith, 868 S.W.2d at 574, wherein the Tennessee Supreme Court held that evidence of a defendant's prior acts of violence and threats against a victim are admissible under Tenn. R. Evid. 404(b) because the prior bad acts are relevant to show the defendant's hostility toward the victim, a settled purpose to harm the victim, and the intent and motive for the killing. The Appellant refutes reliance upon Smith, arguing that the decision did not create a *per se* rule of admissibility for prior violent acts between a defendant and a victim. Rather, he asserts that Smith merely established a rule of admissibility, requiring courts to find (1) that the violent act "indicates the relationship" between the defendant and victim prior to the offense; and (2) that the violent act tends to show that the defendant had "a hostility, malice, intent, and settled purpose to harm the victim."

Initially, we note that our standard of review with respect to the admission of evidence under Tenn. R. Evid. 404(b) is whether the trial court abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). This standard is applicable if the record reveals that the trial court substantially complied with the procedural requirements of Rule 404(b). Id. There is no dispute in the present case of the trial court's compliance.

In State v. Smith, our supreme court held that evidence of a defendant's prior assaults against a victim were admissible because such acts are relevant in establishing the defendant's motive for the killings and the probative value is not outweighed by the danger of unfair prejudice. Smith, 868 S.W.2d at 574 (citing Tenn. R. Evid. 404(b)(3); see generally 4 Am. Jur.2d *Homicide* § 274 (1968); 41 C.J.S. *Homicide* § 206 (1991)); see also State v. Hall, 958 S.W.2d 679, 708 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 238 (1998). While we acknowledge that Smith did not create a *per se* rule of admissibility regarding prior bad acts against the victim, we conclude that the trial court properly found Ms. Gray's testimony relevant to establish (1) the relationship between the parties, (2)

the Appellant's hostility toward the victim, and (3) the Appellant's malice, intent, and settled purpose to harm the victim. Additionally, we concur with the trial court's determination that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Accordingly, we cannot conclude that the trial court abused its discretion in admitting such evidence. This issue is without merit.

## IV. Instructions Regarding Prior Bad Acts

Related to his argument regarding the testimony of Cheryl Gray, the Appellant contemporaneously asserts that the trial court improperly instructed the jury as to how they were to receive such testimony. His argument is twofold: (1) the instruction was incomplete and (2) the instruction amounted to a judicial comment upon the evidence. Following the testimony of Cheryl Gray, the trial court instructed the jury:

> Now, Members of the Jury, before we go further, I want to give you an instruction about this, this prior incident in January of - of '98. You are instructed that the admissibility of this incident is only for the limited purpose of showing the defendant's hostility towards the victim, intent or the settled purpose to harm the victim. For that limited purpose, you may give it as much weight as you think it is entitled.[10]

The Appellant submits that the trial court's limiting instruction was incomplete "because it failed specifically to instruct the jurors that they could not consider Gray's testimony as evidence that the [Appellant] had a propensity to commit violent acts against the victim, or as evidence that he acted in conformity with that character trait in this case."

The trial court is obliged to give jury instructions that fairly and accurately set forth the applicable law as it applies to the facts of a particular case. State v. Stoddard, 909 S.W.2d 454, 460 (Tenn. Crim. App. 1994). Our review of the challenged instruction leads us to conclude that the trial court clearly informed the jury that the only purpose for which they could consider the January 1998 incident was for the limited purpose of showing the Appellant's hostility towards the victim, his intent, or the settled purpose to harm her.

The Appellant also contends that the instruction constitutes an impermissible comment on the evidence because it essentially accredited the testimony of Cheryl Gray rather than leaving that for the jury's determination. Indeed, he argues that the court's instruction that Gray's testimony was

---

[10]At the conclusion of the 404(b) hearing, defense counsel requested a limiting instruction. Defense counsel objected to the language of the court's intended instruction, *i.e.*, the testimony would only be admissible "to show the defendant's hostility to the [victim], malice and settled purpose to harm the victim." Specifically, defense counsel argued that "[t]hose are awfully sort of emotionally laden terms. It seems that there are less harsh or emotionally laden words the Court could use." The trial court replied that he would not instruct on motive, but would instruct that "it was only admitted to show the defendant's hostility towards the victim, intent and purpose to harm the victim and for no other purpose."

admissible "only for the limited purpose of showing the defendant's hostility towards the victim, intent or the settled purpose to harm the victim" implied that the court believed the testimony to "demonstrate those things in fact," rather than leaving this determination to the jury. He suggests that the court should have clarified the instruction by offering a contemporaneous instruction similar to that offered in State v. Steven Tolbert, No. 03C01-9707-CR-00325 (Tenn. Crim. App. at Knoxville, Oct. 7, 1998), perm. to appeal denied, (Tenn. Mar. 15, 1999).[11]

The State asserts that the Appellant has waived this issue by failing to object contemporaneously to the instruction given by the trial court. We agree. The Appellant neither objected to the instruction on this ground nor requested a supplemental instruction as to this issue. Tenn. R. App. P. 36(a). Pursuant to Rule 30(b), Tenn. R. Crim. P., a defendant is permitted to challenge the content of an instruction or the denial of a requested instruction as error despite the failure to object at trial. This rule has been interpreted by our supreme court as allowing claims of the denial of a requested instruction or of a positive error in the jury instructions but not of errors of omissions when no objection or special request was made at trial. See State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996). Alleged omissions in the charge must be raised at trial, or the issue is waived. Id. In addition, the fact that the instructions could have been more detailed does not render the instructions given improper, and absent a special request for an additional charge, a trial court will not be held in error. State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986).

### V. Autopsy Photographs

During the State's case-in-chief, the prosecution sought introduction of fifteen photographs of the victim. In support of the introduction of the photographs, the prosecutor argued that the photographs were relevant for a description of injuries because the autopsy report failed to contain a diagram showing the location of the injuries. Moreover, the State intended to rely upon the photographs to prove the element of premeditation. Specifically, the State sought to establish, by the nature of the injuries, the different weapons used on the victim.[12] Defense counsel conceded the nature and cause of the victim's injuries and the cause of the victim's death. Of the fifteen photographs of the victim tendered for introduction at trial, the trial court only permitted introduction of three

---

[11]The supplemental instruction offered in Tolbert provided:

> [F]or some clarification purposes, the Court is not suggesting to the jury that this testimony that you heard does establish a motive. The Court is allowing this testimony in for you to make that determination as to whether it does or does not effect a motive but that's the only reason that this testimony is allowed, for you to make that determination. You may find that it does not. You may find that it didn't affect the defendant's intent or motive one way or the other or you may find that it does, but that's strictly up to you to make that determination.

[12]The prosecution, in response to defense counsel's submission to the cause of death and the court's inquiry as to why the State could not rely strictly upon medical testimony, replied, "All I can think is a picture is worth a thousand words. I don't know how he can describe some of those obvious cuts and jags to her body."

-24-

photographs.[13]  In so ruling, the trial court stated, "I'll let you use those three, the three indicated, just as illustrative, because they show the back and the arm, but that's as far as I'm willing to go." One photograph depicts wounds to the victim's leg, one photograph depicts wounds to the victim's arm, and the remaining photograph depicts the wounds to the back.  Of relevant import, the photographs demonstrate the odd rectangular, linear and triangular abrasions left on the victim by some type of weapon or weapons with a sharp edge.   Other portions of the victim's body are not visible in these photographs.[14]

The Appellant now contends that the trial court erred in permitting the introduction of the three autopsy photographs of the victim.  Specifically, he contends that the photographs should not have been admitted because the testimony and drawing by the prosecution's medical expert sufficiently described the degree and extent of the victim's injuries.  Additionally, he argues that the photographs are more prejudicial than probative.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases.  State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted).  Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id.  Notwithstanding, a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence.  See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, 526 U.S.1071, 119 S. Ct. 1467 (1999); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993) (citation omitted); see also Tenn. R. Evid. 401.  Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character.  However, if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice the defendant.  Banks, 564 S.W.2d at 950-51.  Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact.  Vann, 976 S.W.2d at 103 (emphasis added); Braden, 867 S.W.2d at 758; see also Tenn. R. Evid. 403.  In this respect, we note that photographs of a murder victim are prejudicial by their very nature.  However, prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial.  Rather, what is excluded is evidence which is "unfairly prejudicial," in other words, that evidence which has "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily an emotional one."  See Vann, 976 S.W.2d at 103 (citations omitted).

---

[13]Initially, the trial court sustained the Appellant's objection to the photographs.  The State then requested admission of the photographs depicting the defensive wounds to the arms and legs.  The court reconsidered its ruling and permitted introduction of the three photographs ultimately admitted.

[14]We acknowledge that the trial court specifically prohibited introduction of any photograph depicting the victim's face.

Upon review, we find the photographs relevant and lacking danger of prejudice. The photographs are not gruesome,[15] and, although not disputed, the photographs depict the number, location, and nature of the wounds which could not be actually relayed verbally. See generally State v. McCormick, 778 S.W.2d 48, 53 (Tenn. 1989). Moreover, the photographs clarify the testimony of Dr. Gerber in explaining the nature of the victim's wounds. See State v. Morris, 24 S.W.3d 788, 811 (Tenn. 2000), Appendix, cert. denied, –U.S.–, 121 S. Ct. 786 (2001) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Smith, 868 S.W.2d at 576). We do, however, reject the State's motive of using the photographs to establish premeditation. The fact that repeated blows were inflicted on the victim is not sufficient, by itself, to establish premeditation for a first-degree murder conviction.[16] State v. Goss, 995 S.W.2d 617, 627 (Tenn. Crim. App. 1998), perm. to appeal denied, (Tenn. 1999) (citing Brown, 836 S.W.2d at 542). Therefore, the probative value of the picture relative to premeditation is questionable. Id. at 627. Finally, we conclude that the photographs were not especially shocking or gruesome so as to preclude their admission. In weighing whether the probative value of the photographs outweighs any prejudicial effect, we acknowledge that the admission of any such photographs would be considered prejudicial to a defendant's case. Notwithstanding, in the present case, we cannot conclude that introduction of these three photographs had a tendency to suggest a decision on an improper or unfair basis. The photographs are relevant and are not so unfairly prejudicial as to bar their admission. Accordingly, we cannot conclude that the trial court abused its discretion by admitting these photographs. See Tenn. R. Evid. 403. This issue is without merit.

## VI. Lesser-Included Instruction

The Appellant was charged with first-degree premeditated murder. During the trial, the Appellant requested that the court charge the jury as to the lesser offenses of second-degree murder, voluntary manslaughter, reckless homicide and criminally negligent homicide. The court denied the request as to reckless homicide and criminally negligent homicide. The court instructed the jury on first-degree premeditated murder, second-degree murder and voluntary manslaughter. The jury found the Appellant guilty of premeditated murder. Subsequently, the trial court granted the Appellant's motion for judgment of acquittal and reduced the conviction to second-degree murder. The Appellant now argues that the trial court erred by failing to instruct the jury on the lesser-included offense of reckless homicide.

---

[15]We acknowledge the fact that any photograph of a murdered victim is, by its very nature, unpleasant. However, the photographs submitted to the jury in the instant case were not of the magnitude to deny admission.

[16]Our supreme court also stated that photographs of the victim may be admitted "as evidence of the brutality of the attack and the extent of force used against the victim, from which the jury could infer malice, either express or implied." Goss, 995 S.W.2d at 627 (citing Brown, 836 S.W.2d at 551); see also Smith, 868 S.W.2d at 576 (Trial court did not abuse its discretion by admitting a photograph of the victim when the trial court stated that the photograph was relevant to show " 'premeditation, malice and intent because of the multiplicity of these wounds and an obvious intent of whoever was inflicting these wounds.' ").

Initially, we acknowledge that, in Tennessee, irrespective of a party's request for a lesser-included jury instruction, "it is the duty of all judges charging juries in cases of criminal prosecutions for any felony . . . to charge the jury as to all of the law of each offense included in the indictment. . . ." Tenn. Code Ann. § 40-18-110(a). Moreover, as the State concedes, the offense of reckless homicide is a lesser-included offense of first-degree premeditated murder.[17] See generally Burns, 6 S.W.3d at 453. This fact alone, however, is not dispositive of whether error occurred. See generally Burns, 6 S.W.3d at 453.

Determining whether a lesser-included offense must be charged in the jury instructions is a two-part inquiry. Burns, 6 S.W.3d at 469. First, the court must determine whether any evidence exists that reasonable minds could accept as to the application of a lesser-included offense. Id. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Id. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. Id. at 467-69.

"Reckless homicide" is "a reckless killing of another." Tenn. Code Ann. § 39-13-215 (1997).

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31) (1997). We are unable to conclude that under the test announced in Burns that reasonable minds could find that the Appellant's killing of his wife constituted reckless homicide. Burns, 6 S.W.3d at 469.

Under the definition of recklessness, the jury would have been required to find that the Appellant either (1) acted recklessly with regard to the circumstances surrounding his conduct or (2) consciously disregarded a substantial and unjustifiable risk that death would occur. The proof clearly established that the victim suffered repeated blows from a weapon or weapons that left rectangular, linear and triangular marks on her body. These acts were not merely reckless but rather intentionally

---

[17]An offense is a lesser-included offense:
(a) if all of its statutory elements are included within the statutory elements of the offense charged;
or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
    (1) a different mental state indicating a lesser kind of culpability. . .

Burns, 6 S.W.3d at 466-467.

inflicted with a conscious objective to produce death. Moreover, to suggest that the "torsion, twisting and tearing of the [victim's] head and moving about of the head so that there's enough force to tear the vessels underneath" constitutes merely a gross deviation from the standard of care that an ordinary person would exercise requires a quantum leap which neither "reasonable minds" nor a reviewing court is required to accept. See generally Burns, 6 S.W.3d at 469. For these reasons, the first inquiry of Burns, *i.e.*, that reasonable minds could accept as to the lesser offense, has not been met. Accordingly, we find that the trial court did not err in refusing to instruct the jury as to the offense of reckless homicide. This issue is without merit.

## VII. Sentencing

A sentencing hearing was held on January 14, 2000. No proof was presented, rather the State relied upon the presentence report and the evidence introduced at trial. The evidence in the presentence report indicates that the fifty-three-year-old Appellant has a prior criminal history consisting of first-degree murder, aggravated assault, assault and battery, resisting arrest, and numerous driving on a revoked license convictions. His 1975 conviction for first-degree murder resulted in a sentence of forty years confinement in the Department of Correction. The Appellant is both a high school and college graduate, however, verification of the Appellant's bachelor's degree could not be obtained. With the exception of high blood pressure and a history of alcohol abuse, he alleges to be in good health. The Appellant admitted that he had occasionally smoked marijuana in the past. He has completed an anger management class and has participated in treatment programs, *i.e.*, "Self Awareness and Awareness of Others" and "Recovery Dynamics."

After hearing the argument of counsel, the trial court sentenced the Appellant to forty years confinement as a range II offender. In imposing such a sentence, the trial court placed great emphasis on the Appellant's prior criminal history, specifically, his prior murder conviction, the fact that the victim was treated with extreme cruelty, and the use of a deadly weapon. See generally Tenn. Code Ann. § 40-35-114(1), (5), (9) (2000 Supp.). Additionally, the court stated "there really are no mitigating circumstances" applicable. The trial court properly determined that the Appellant was a range II offender of a class A felony with an applicable sentencing range of "not less than twenty-five (25) nor more than forty (40) years." Tenn. Code Ann. § 40-35-112(b)(1)(1997). When there are enhancement factors and no mitigating factors, the trial court may set the sentence at or above the midpoint of the range. Tenn. Code Ann. § 40-35-210(d); see also Tenn. Code Ann. § 40-35-210(c). After weighing the enhancement factors, the trial court imposed the maximum forty-year sentence. The Appellant now challenges the maximum sentence imposed by the trial court.

This court's review of the length, range, or manner of service of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is only applicable if the record demonstrates that the trial court properly considered relevant sentencing principles. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the Appellant to show that the sentence imposed was improper. Id.; State v. Fletcher, 805

S.W.2d 785, 786 (Tenn. Crim. App. 1991); Sentencing Commission Comments, Tenn. Code Ann. § 40-35-401(d).

Within his challenge to the sentence imposed, the Appellant first contends that, because "the trial court failed to state on the record its factual basis for the application of enhancement factor (9)," the trial court improperly applied this factor when determining the appropriate sentence. The Appellant maintains that "no weapon was ever identified or recovered." Additionally, while he acknowledges that the medical examiner testified that many of the victim's injuries would have been caused by some sort of weapon, he argues that the medical examiner also noted that many of the injuries could have resulted from a punch. Finally, he concludes that there is no medical evidence that the victim's fatal injury was inflicted by the use of a weapon and, although he concedes that a weapon was used at some point, there is no evidence from which one can conclude that the weapon "was, in fact, a deadly weapon."

> During the trial, Dr. Gerber described certain injuries sustained by the victim:
> Well, throughout her body, and on the face – the side of the face, both sides of the face and as well as the upper extremities were these sharp marginated geometric figures. They're either triangle and mostly rectangular that do not represent a fist or a hand. They represent something else.
> . . .
> Both of much of the injuries, in front of the chest were pretty much confined to the upper part of the torso here. This is right and this is left. And these are triangular, again, and rectangular. Here there's actually a cross form, somewhat of a cross form, t-shaped. I had already earlier drawn the triangle here on the side of the left arm that I pointed out. These are all abrasions. . . .
> . . .
> Well, most of these [injuries] have some kind of a sharp edge to them. In fact, all of them have some degree of sharpness to their borders.

Dr. Gerber testified that the injuries with a "sharp edge" probably resulted from the use of some type of weapon. There is no doubt that a weapon was used. Our criminal code defines a "deadly weapon" as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5) (1997). Clearly, from the injuries sustained by the victim in the present case, the weapon employed by the Appellant constitutes a "deadly weapon." Additionally, there is no requirement in the sentencing provisions that the "deadly weapon" employed actually killed the victim. Rather, the proof must simply establish that "[t]he defendant possessed or employed a . . . deadly weapon during the commission of the offense." Tenn. Code Ann. § 40-35-114(9). Accordingly, application of this enhancement factor is proper.[18]

---

[18]Although not argued by the Appellant in this appeal, we note that the use of a deadly weapon is not an element of second-degree murder. See, e.g., State v. Baxter, 938 S.W.2d 697 (Tenn. Crim. App. 1996).

The Appellant additionally alleges that "the trial court erred by failing to apply the statutory mitigating factor that 'the defendant assisted the authorities in locating or recovering any property or person involved in the crime.'" See Tenn. Code Ann. § 40-35-113(10). He contends that the trial court failed to consider that the Appellant was responsible for making the initial report to the police about the victim's location and that he arrived at the police station voluntarily. Essentially, he alleges that it was his cooperation with the police that eventually led to his arrest and conviction.

While the trial court did not refute the proof that the Appellant did call "911" three times to notify authorities regarding the location of the victim's body, the court noted that the Appellant did so "to mislead the police." Additionally, the court acknowledged counsel's argument that the Appellant did voluntarily report to the police station. Notwithstanding, the court found:

> I think he thought he could maybe outsmart the police or mislead the police, and that's why he came down there. And as defense counsel are probably aware, 49 out of 50 times when defendants attempt to do that, it's a mistake, and it was a mistake in this case, because it actually helped the police.

In response to the Appellant's argument, the State argues that application of mitigating factor (10) requires "that the defendant help authorities locate someone or something involved in the crime." This argument has previously been rejected by this court. Indeed, this court held that Tenn. Code Ann. § 40-35-113(10) "is broad enough to apply not only to locating any fellow perpetrators and instruments of crime, but to locating victims and property that are the objects of criminal conduct, as well." State v. Lord, 894 S.W.2d 312, 318 (Tenn. Crim. App. 1994). Although we find that the trial court should have applied the mitigating factor contained in Tennessee Code Annotated § 40-35-113(10), we find that this mitigating factor should be afforded little weight and does not justify a modification of Appellant's sentence. See, e.g., State v. David Ryan Swanson, No. E1998-00041-CCA-R3-CD (Tenn. Crim. App. at Knoxville, May 16, 2000) (defendant deserves credit for seeking help and for assisting the police in "clearing all of the cases that he had committed"); State v. Dennis E. Diamond, No. 01C01-9905-CR-00150 (Tenn. Crim. App. at Nashville, Feb. 18, 2000), perm. to appeal denied, (Tenn. Sept. 18, 2000) (trial court considered, but declined to give substantial weight to, the fact that appellant's own admissions brought the crime to light and that he cooperated with law enforcement in its investigation); State v. Terry Logan, No. 02C01-9609-CC-00297 (Tenn. Crim. App. at Jackson, Apr. 10, 1997) (defendant called 911 following the incident); State v. Tommy Dixon, No. C.C.A. 01C01-9402-CC-00052 (Tenn. Crim. App. at Nashville, Sept. 20, 1995) (defendant admitted he shot the victim and told officers where he had hidden the weapon. Slight mitigation might have been in order in these circumstances); State v. Aaron V. Yelloweyes, No. 01C01-9407-CC-00256 (Tenn. Crim. App. at Nashville, May 11, 1995), perm. to appeal denied, (Tenn. Sept. 25, 1995) (defendant assisted the police in finding the site where he had buried the victim). In this case, the Appellant's assistance in recovering the victim's body must be measured as mitigation against his attempt to thwart police efforts to discover him as the main suspect. Under the circumstances in this case, we do not believe that the Appellant's assistance constitutes such mitigation as to warrant a

reduction in the sentence imposed. Thus, proper consideration of the three enhancement factors justifies the forty-year sentence. This issue is without merit.

For the reasons set forth herein, we affirm the judgment of conviction and sentence entered by the Davidson County Criminal Court.

_____
DAVID G. HAYES, JUDGE